UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JESSELYN A. RADACK,<br><br>                Plaintiff,<br><br>      v.<br><br>UNITED STATES DEPARTMENT OF JUSTICE,<br>                Defendant. | Civil Action 04-01881 (HHK) |

MEMORANDUM OPINION

Jesselyn Radack brings this action against her former employer, the United States Department of Justice ("DOJ" or "the Department"), alleging that DOJ's Office of Professional Responsibility ("OPR") violated the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.*, by acting contrary to DOJ policy when it referred allegations of Radack's professional misconduct to District of Columbia and Maryland bar authorities. Before the court is DOJ's motion to dismiss, or in the alternative, for summary judgment (Dkt. #13/14). Upon consideration of the motion, the opposition thereto, and the record of this case, the court concludes that Radack's request for injunctive relief must be dismissed for lack of subject matter jurisdiction, and DOJ's motion for summary judgment must be granted for the remainder of the claim.

I. BACKGROUND

Although the court has previously provided a detailed account of the facts underlying this case, *see Radack v. United States Dep't of Justice*, 402 F. Supp. 2d 99 (D.D.C. 2005), the court offers a brief synopsis in order to provide context for its review of the instant motion.

Radack worked at DOJ from October 1995 to April 2002, spending her final three years there as a legal advisor in the Professional Responsibility Advisory Office ("PRAO"), which provides advice to DOJ attorneys regarding professional responsibility and choice of law issues. In accordance with her responsibilities at PRAO, in December of 2001 Radack rendered advice to a DOJ attorney inquiring about the "ethical propriety of a proposed FBI interview" of John Walker Lindh.[1]  Compl. ¶ 11.  After discussing the inquiry with PRAO's senior legal advisor, Radack concluded that the proposed interview would be a pre-indictment and custodial overt interview that was not authorized by law.  On December 10, 2001, Radack learned that, despite her advice, the FBI had nonetheless interviewed Lindh.  Radack immediately told her supervisor, Claudia Flynn, that PRAO's advice had been ignored.  Flynn responded by saying that "PRAO's involvement in the matter was over." *Id.* ¶¶ 14–15.

On January 15, 2002, the United States Attorney's Office filed criminal charges against Lindh in the United States District Court for the Eastern District of Virginia.  In response to a discovery letter from Lindh's attorney, the United States Attorney's Office sought all communications concerning PRAO's assistance with the Lindh matter.  After an exhaustive search, Radack provided all responsive e-mails to her supervisor to be delivered to the prosecutors handling the criminal proceedings.

Radack eventually came to believe that the e-mails she collected were not produced in their entirety.  Radack, however, was unaware that a number of the e-mails she suspected were withheld were in fact submitted to the court, *ex parte* and under seal, for an *in camera* inspection

---

[1] John Walker Lindh is an American citizen who was captured by United States armed forces in Afghanistan and eventually pleaded guilty to charges linking him to assisting the Taliban.  Compl. ¶ 11; http://notablecases.vaed.uscourts.gov/1:02-cr-00037/Index.html.

in connection with the government's motion for a protective order.  On April 1, 2002, the court granted the government's motion for a protective order and prohibited disclosure of the PRAO e-mails.

After being (what she characterizes as) "constructively fir[ed]," *id.* ¶ 24, Radack resigned from PRAO on April 5, 2002, and began working at a law firm.  In June 2002, Radack heard a broadcast on National Public Radio stating that DOJ claimed it never took the position that Lindh was entitled to counsel while in custody in Afghanistan.  The broadcast led Radack to believe that her e-mails had not been produced to the United States Attorney's Office or the court "because [she] did not believe the Department would have the temerity to make public statements contradicted by its own court filings." *Id.* ¶ 27.  Still unaware that the e-mails had been turned over and were subject to a protective order, Radack disclosed her e-mails to *Newsweek* magazine, where they appeared in the online edition on June 15, 2002.

On June 19, 2002, the Lindh court instructed the government to file a written submission that addressed whether the e-mails were disclosed by an individual bound by the protective order.  The Office of the Inspector General ("OIG") subsequently initiated an investigation and concluded that Radack had disclosed the e-mails.  Though DOJ ultimately did not seek an indictment against her, Radack alleges that during the course of the investigation, an OIG agent informed her law firm that she was under criminal investigation and "enlisted their assistance in interrogating" her.  *Id.* ¶ 35.  She claims that her refusal to speak with the agent caused her to be fired from her law firm.

On October 11, 2002, DOJ filed a report with the court identifying Radack as the source of the disclosure. The court, however, determined that Radack's disclosure did not technically violate the protective order. On September 11, 2003, DOJ informed Radack's counsel that it had closed the criminal investigation of Radack. Subsequently, on October 31, 2003, OPR sent letters to the District of Columbia and Maryland bar authorities indicating that Radack "may have violated her duty not to knowingly reveal attorney-client privileged information" by disclosing the e-mails to *Newsweek*. *Id.* ¶ 40. The Attorney Grievance Commission of Maryland dismissed the referral against Radack on February 23, 2005, but the District of Columbia bar investigation is still pending, and Radack remains unemployed.

## II.  DISCUSSION

DOJ moves to dismiss Radack's claims or, in the alternative, for summary judgment. DOJ argues that dismissal is warranted for a variety of reason, among them, that Radack lacks Article III standing. DOJ submits that Radack's claims must be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(1)[2] for lack of subject matter jurisdiction because her injury is not "fairly traceable" to the Department and because the requested relief, if granted, would not

---

[2] Federal Rule of Civil Procedure 12(b)(1) provides that a complaint may be dismissed for lack of subject matter jurisdiction. FED. R. CIV. P. 12(b)(1). On a motion to dismiss for lack of subject matter jurisdiction, the plaintiff bears the burden of establishing that the court has jurisdiction. *Brady Campaign to Prevent Gun Violence United with Million Mom March v. Ashcroft*, 339 F. Supp. 2d 68, 72 (D.D.C. 2004). A court must accept the non-movant's factual allegations as true when reviewing a motion to dismiss under Rule 12(b)(1), *see Leatherman v. Tarant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 164 (1993), but such allegations will receive closer scrutiny than when resolving a Rule 12(b)(6) motion. *Brady*, 338 F. Supp. 2d at 72. A court may also consider material beyond the allegations in the plaintiff's complaint when determining whether it has subject matter jurisdiction pursuant to Rule 12(b)(1). *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624–25, n.3 (D.C. Cir. 1997).

redress her injury.  The court will address the issue of Article III standing first, as it must.  *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998).

**A.  Article III Standing**

"To have Article III standing, a plaintiff must demonstrate an 'actual or immediate' 'injury-in-fact' that is 'fairly traceable' to the challenged conduct and 'likely' to be 'redressed by a favorable decision.'" *Tozzi v. U.S. Dep't of Health and Human Servs.*, 271 F.3d 301, 307 (D.C. Cir. 2002) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–561 (1992)).  DOJ asserts that Radack cannot establish the causation element because the complained-of injury was "the result of independent action of third parties not before the Court," Def.'s Mot. at 19, and because the injury "is more fairly traced to her *own* conduct, rather than to any act of the Department." *Id.* at 20 (emphasis in original).  The Department further asserts that Radack cannot establish the redressability element because "[n]either the declaration nor the injunction requested by plaintiff . . . would have a substantial likelihood of redressing plaintiff's alleged injury." *Id.* at 21.  The court analyzes each element of standing in turn.[3]

Radack and DOJ disagree about the effect that OPR's referral letters had on the bar authorities.  Radack contends that the "bars automatically investigate complaints coming from the DOJ" and that the D.C. Bar was obligated, under its own rules, to investigate.  Pl.'s Opp'n at 20.  That is, in Radack's view OPR's referral letters legally required the D.C. and Maryland bars to investigate her; the investigation caused the complained-of injury; and therefore the injury is

---

[3]  DOJ does not contest the injury-in-fact element of Radack's standing.  But because standing goes to the court's power to adjudicate the case, the court must still independently determine that Radack was injured.  It is clear, though, that she has sustained injury in the form of a damaged reputation and reduced employment prospects.

fairly traceable to DOJ.  The Department disputes this reading of the bars' policies, asserting that the bars have discretion to decline to investigate a referral from DOJ, and that "OPR's letter simply put bar counsel on notice of plaintiff's conduct" and that "[a]ny action taken by the bars as a result of that notice . . . was outside the Department's control."  Def.'s Reply at 13.

Whether the referral letters "obligated" the bars to investigate or merely put them on notice is immaterial.  "Where, as here, the alleged injury flows not directly from the challenged agency action, but rather from independent actions of third parties, we have required only a showing that the agency action is at least a substantial factor motivating the third parties' actions."  *Tozzi*, 271 F.3d at 308 (quotations omitted).  *See also Bennett v. Spear*, 520 U.S. 154, 168–169 (1997) (stating that the government's argument that the injury was not traceable to it, but rather to the decision of a third party "wrongly equates injury 'fairly traceable' to the defendant with injury as to which the defendant's actions are the very last step in the chain of causation.").  DOJ concedes that OPR's referral letter "required initial consideration by bar counsel to determine whether proceedings should be pursued."  Def.'s Reply at 14.  This obligation to consider whether to pursue proceedings "is at least a substantial factor motivating the third parties' actions" and so standing is not defeated simply by saying that the bar authorities, rather than DOJ, caused Radack's injury.

Nor does it suffice to say that DOJ did not cause Radack's injury because "it is more fairly traced to her *own* conduct."  Def.'s Mot. at 20 (emphasis in original).  "Standing is not defeated merely because plaintiff has in some sense contributed to his own injury. . . . Standing is defeated only if it is concluded that the injury is so completely due to the plaintiff's own fault as to break the causal chain."  13 Charles Alan Wright, Arthur R. Miller & Edward H.

COOPER, FEDERAL PRACTICE AND PROCEDURE § 3531.5, at 932–933 (2d ed. Supp. 2005); *cf. Petro-Chem Processing, Inc. v. Envtl. Prot. Agency*, 866 F.2d 433, 438 (D.C. Cir. 1989) (finding no standing where plaintiffs' injuries stemmed entirely from their voluntary decision to incur liability). Radack's disclosures to *Newsweek* have, of course, hampered her employability, independent of any third-party action. But assuming the accuracy of Radack's allegations, the bars' investigations have exacerbated this harm. *See* Pl.'s Opp'n at 11 ("Because of the pending bar proceedings, any law firm that might hire her would be subject to an immediate increase in their malpractice liability insurance premiums."). The court therefore concludes that Radack has sufficiently established that her injury is fairly traceable to DOJ, and turns to the question of redressability.

To satisfy the redressability element of Article III standing, there must be a "substantial likelihood that the requested relief will remedy the alleged injury in fact." *Vermont Agency of Natural Res. v. United States ex re. Stevens*, 529 U.S. 765, 771 (2000). Radack "must demonstrate standing for each form of relief sought." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 185 n.8 (2000). Her complaint seeks injunctive and declaratory relief,[4] Compl. ¶¶ 61–62, and the court considers standing for each in turn.

### 1. Injunctive Relief

---

[4] Radack's complaint seeks money damages under the Privacy Act, but that claim was dismissed in an opinion and order dated August 9, 2005. *Radack v. United States Dep't of Justice*, 402 F. Supp. 2d 99 (D.D.C. 2005).

In addition, Radack also seeks reimbursement for her attorney's fees. However, Radack "cannot achieve standing to litigate a substantive issue by bringing suit for the cost of bringing suit. . . . An interest in attorney's fees is insufficient to create an Article III case or controversy where none exists on the merits of the underlying claim." *Steel Co.*, 523 U.S. at 107 (quotations omitted ). Therefore, if Radack is to establish standing, it must be on the basis of injunctive or declaratory relief.

"'Because injunctions regulate future conduct, a party has standing to seek injunctive relief only if the party alleges, and ultimately proves, a real and immediate—as opposed to merely conjectural or hypothetical—threat of future injury.'" *Natural Res. Def. Council v. Peña*, 147 F.3d 1012, 1022 (D.C. Cir. 1998) (quoting *Church v. City of Huntsville*, 30 F.3d 1332, 1337 (11th Cir. 1994). Radack has not alleged anywhere in the record that DOJ is likely to injure her in the future—or even suggested that this is a possibility. Rather, the request for an injunction appears to have a punitive animus or be based on a generalized desire for vindication. *See* Pl.'s Opp'n at 20 ("a declaration and injunction would redress Ms. Radack's injury by labeling the Department's action as what it really was—retaliation.").[5] Neither basis is sufficient for granting injunctive relief. *See Peña*, 147 F.3d at 1022 ("injunctive relief principally serves a remedial purpose, not a punitive one, and thus the injunction's collateral punitive effects do not by themselves satisfy Article III's redressability requirement."); *Steel Co.*, 523 U.S. at 107 ("although a suitor may derive great comfort and joy from the fact that . . . a wrongdoer gets his just desserts, or that the Nation's laws are faithfully enforced, that psychic satisfaction is not an acceptable Article III remedy because it does not redress a cognizable Article III injury."). The court therefore holds that Radack lacks standing to pursue injunctive relief. That component of her claim is therefore dismissed under Rule 12(b)(1).

---

[5] To the extent that the opposition brief could be read to suggest that an injunction prohibiting future disclosures would somehow persuade either the D.C. bar to drop its investigation or prospective employers to disregard the past referral, the Court finds this argument unavailing.

### 2. Declaratory Relief

DOJ argues that any potential benefits derived from declaratory relief would depend on action by third parties, a proposition that Radack does not contest. *See* Pl.'s Opp'n at 20. This fact alone is not dispositive, however, as "[s]tanding can be established by showing that 'the practical consequence [of the court's order] . . . would amount to a significant increase in the likelihood that the plaintiff would obtain relief that directly redresses the injury suffered.'" WRIGHT, MILLER & COOPER § 3531.6, at 997 (quoting *Utah v. Evans*, 536 U.S. 452, 464 (2002)).

Although it seems difficult for Radack to establish that declaratory relief "would amount to a significant increase in the likelihood" that her injury will be redressed, the court holds that it would be premature at this point to dismiss the complaint for lack of standing, without first giving Radack the opportunity to produce evidence supporting her claims about the likely effects of a favorable judgment. *See Bennett*, 520 U.S. at 167–68 ("each element of Article III standing 'must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of litigation.'") (quoting *Lujan*, 504 U.S. at 561). According to Radack, in the event of a judgment in her favor, "employers would know that the referral was arbitrary and capricious, and therefore they could disregard it as an impediment to hiring Ms. Radack. The declaration and injunction . . . while not binding on the bar, would certainly provide a persuasive reason for D.C. to dismiss the outstanding complaint." Pl.'s Opp'n at 20. Radack is entitled to have the allegations in her

complaint construed favorably; as such, it is possible that Radack could support her allegations by demonstrating that the bar authorities have previously dismissed investigations when DOJ has admitted (or a court has declared) that it referred the case to them improperly.

Having established injury-in-fact, causation, and redressability, Radack has Article III standing to seek declaratory relief and attorney's fees.

**B. APA Claim**

Finding that Radack has standing to pursue at least some of her requested relief, the court proceeds to the merits of her APA claim, which DOJ argues is deficient because (a) OPR's decision to send referral letters did not constitute final agency action and is therefore not judicially reviewable; (b) if OPR's actions are reviewable, OPR's referral policy, as expressed in its letter to Congress (and in the synopsis of that letter published on DOJ's website), was not binding on the department; and (c) if the policy is binding, OPR's decision to send referral letters did not violate it and therefore was not "arbitrary, capricious, an abuse of discretion," or otherwise a violation of the APA.[6] *See* 5 U.S.C. § 706(2). Because OPR's decision to send referral letters to the Maryland and D.C. bars did not violate its own policies concerning when bar referrals are permissible, DOJ's motion for summary judgment will be granted.[7]

---

[6] While summary judgment is appropriate to resolve disputes over administrative actions, the court does not employ the standard under FED. R. CIV. P. 56 but, instead, applies the standard of review under the relevant statute, if any, and the APA. *Ackerman v. United States*, 324 F. Supp. 2d 1, 5 (D.D.C. 2004) (citing *Gonzalez v. United States Dep't of State*, 135 F. Supp. 2d 193, 195 (D.D.C. 2001)). Under the APA, agency decisions should not be set aside unless they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *United States v. Paddack*, 825 F.2d 504, 513 (D.C. Cir. 1987); 5 U.S.C. § 706.

[7] Because the alleged "policy" that forms the gravamen of Radack's complaint does not preclude DOJ from the action it took, the court need not determine whether the statements upon which Radack relies establish, as a matter of law, a policy enforceable against the agency, or

The policy at issue—according to Radack—only permits OPR to refer an attorney to bar counsel once the agency has concluded that an attorney engaged in professional misconduct that was intentional or reckless. Compl. ¶ 58. Even assuming such a policy exists and is binding on DOJ, it is inapplicable to the bar referral that is the focus of the instant case.

In an attempt to demonstrate the existence of the aforementioned policy, Radack directs the court's attention to two statements. One, an August 2000 report from the General Accounting Office, states that "after completing its investigation, if OPR substantiates that a Justice attorney committed intentional misconduct, its policy is to notify the state bar(s) of which the attorney is a member of these findings." *Id.* ¶ 57. The other, the DOJ: OPR 2000 Annual Report, describes a letter from the Department to Congress by saying that the letter announced DOJ's adoption of "a revised notification policy, requiring notification of the relevant state bar disciplinary authorities whenever OPR concludes, and the Department affirms, that a Department attorney engaged in professional misconduct, whether through intentional action or through the reckless disregard or a professional standard or obligation." *Id.*

From these documents, Radack asks the court to conclude that OPR can refer cases to state bar associations *only* when the listed criteria—the completion of an investigation, a conclusive finding of professional misconduct, and an affirmation thereof by the Department—are met. She insists that because none of these criteria was met in her case, OPR "violated its own policy," *id.* ¶ 58, thereby acting in a manner that was "arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law." This argument is unpersuasive.

---

constitute final agency action reviewable under the APA.

Nothing in the texts of the reports suggests that they provide an exhaustive or exclusive list of the circumstances under which OPR is permitted to refer attorneys to bar authorities. The language and context of the actual letter to Congress (as opposed to the subsequent synopsis that Radack quotes) make this even clearer. In response to a Congressional inquiry that asks, in part, why OPR does not refer *more* cases to bar authorities, OPR reviews its existing policy on referrals by stating that "a broad range of misconduct is reported to state bars by OPR" and that "OPR notifies the appropriate bar disciplinary authorities of any finding that an attorney committed intentional professional misconduct . . . whether or not the bar was aware of the allegation or judicial finding on which OPR initiated its investigation." Def.'s Ex. B at 2 (Letter to Congress). It goes on to state that OPR has "recently reexamined its bar notification policy and has determined *to expand it* so that OPR now will notify the appropriate bar disciplinary authorities if it finds that an attorney committed professional misconduct," whether that misconduct was intentional or merely reckless. *Id.* at 2–3 (emphasis added).

To the extent that this policy is binding on DOJ at all—a question that the court does not resolve here—it is only so in that it *requires* notification when certain conditions are met. It is also clear that the policy modification announced in the letter to Congress merely expanded the list of cases that *must* be referred to the state bars. It does not follow from this that DOJ may not refer a case to state bar associations at any other time.

Indeed, the letter to Congress upon which Radack relies states explicitly that "OPR will continue its policy of referring to the bar allegations against attorneys who have left the Department where the allegations fall more appropriately within the bar's investigatory jurisdiction or the attorney refuses to cooperate with OPR." *Id.* at 3. This stated referral policy

appears to encompass Radack's case exactly—OPR is referring to the bar authority allegations against a former DOJ attorney because further investigation seems to fall more appropriately under the bars' purview than the Department's.  And, even if this allegation-referral policy does not cover OPR's actions in this case, Radack has not presented any evidence that would allow the court to conclude that the Department has adopted a policy that prohibits it from acting as it did.

Even if the court were to assume *arguendo* that Radack's interpretation of DOJ's referral policy was a plausible one, she would be unable to overcome the "heavy burden" that a plaintiff assumes when she "assert[s] that the agency has misconstrued its own standards." *Gen. Carbon Co. v. Occupational Safety & Health Review Comm'n*, 860 F.2d 479, 483 (D.C. Cir. 1988).  In such cases, "[a]n agency's interpretation of its own regulations will be accepted unless it is plainly wrong." *Id.; see also Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994) ("We must give substantial deference to an agency's interpretation of its own regulations . . . . [T]he agency's interpretation must be given controlling weight unless it is plainly erroneous or inconsistent with the regulation.").  DOJ interprets its referral policy to permit OPR to refer OIG's findings from its investigation of Radack to the D.C. and Maryland bar associations.  The court holds that this interpretation is not plainly erroneous or inconsistent with the regulation.  Consequently, DOJ's conduct did not violate the APA.

## III.  CONCLUSION

For the aforementioned reasons, the court concludes that Radack's request for injunctive relief must be dismissed and DOJ's motion for summary judgment must be granted with respect to the remainder of the complaint.  An appropriate order accompanies this memorandum opinion.

                                                   Henry H. Kennedy, Jr.
                                                   United States District Judge

Date: July 17, 2006.